T.C. Memo. 2013-7

UNITED STATES TAX COURT

WILLIAM P. ADAMS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23659-07.                    Filed January 10, 2013.

<u>Anthony V. Diosdi</u>, for petitioner.

<u>Shannon F. Edelstone</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The respondent (the IRS) issued a notice of deficiency

for the year 2004 to the petitioner, William Adams, determining:

- a $207,598 income-tax deficiency,

- a $45,179.55 addition to tax under section 6651(a)(1),

**[\*2]**  •  a $25,099.75 addition to tax under section 6651(a)(2), and

•  a $5,732.41 addition to tax under section 6654(a).

Adams timely filed a petition under section 6213(a) for redetermination of the deficiency and the additions to tax.[1]  We have jurisdiction under section 6214.  The issues for decision are:

•  Did Adams' sale of his San Francisco house in June 2004 qualify for nonrecognition treatment as a part of a section 1031 "like-kind" exchange?  We hold that it did.

•  What are the amounts of Adams' income and deductions from his rental properties?  We find that he received $7,200 in rent and is entitled to a related deduction of $1,054.

•  Is Adams entitled to certain deductions for his electrical-safety-consulting business for 2004?  We find that Adams is entitled to deductions of $4,416.07, resulting in taxable income of $6,458.93 from the business.

•  Is Adams liable for the section 6651(a)(1) and (2) and section 6654(a) additions to tax?  We hold that he is liable for the section 6651(a)(1)

---

[1]All references to sections are to the Internal Revenue Code in effect for the year in issue.  All references to Rules are to the Tax Court Rules of Practice and Procedure.

[*3] and (2) additions to tax and that he is liable for the section 6654(a) addition to tax unless Rule 155 computations show that he qualifies for the exception under section 6654(e)(1).

## FINDINGS OF FACT

Some facts have been stipulated, and they are so found. William Adams is a semiretired electrical engineer who resided in California when he filed the petition. We refer to him as Adams. We refer to his son, whose name is also William Adams, as Bill.

1.    The San Francisco House, the Eureka House, and the Section 1031 Exchange

In 1963, Adams bought a house in San Francisco (San Francisco house) for $26,000.[2] He and his family lived in the house until 1979, when they moved to Rohnert Park, California. Soon after moving to Rohnert Park, Adams rented the San Francisco house to an acquaintance. During the period that he rented out the house--1979 to 2003--Adams made various improvements to it, including upgrading the electrical service, installing a circuit for an electric range, installing

_____

[2]The $26,000 consisted of the $24,000 sale price and $2,000 in closing costs and commissions.

The purchase was made by Adams and his wife, but for simplicity, we refer to the purchase and all subsequent transactions concerning the San Francisco house as being made by Adams. Neither Adams nor the IRS claims that his wife's involvement changes the tax consequences.

**[*4]** three energy-efficient windows, installing carpet, painting the exterior, painting the kitchen, and patching and ultimately replacing the roof.

After the renter moved out in 2003, Adams decided to sell the San Francisco house. He consulted a real-estate broker to help him with the sale.

At the broker's suggestion, Adams engaged an intermediary known as a 1031-exchange facilitator to reduce the income tax on the gain from the sale of the San Francisco house. The sale of the San Francisco house and the purchase of the Eureka house (discussed below) took place through the intermediary.[3] On June 17, 2004, Adams sold the San Francisco house for $572,000.[4] Adams understood that he had 45 days after selling the San Francisco house to identify a property to buy (through the intermediary). See sec. 1031(a)(3)(A). On July 7, 2004, Adams

---

[3]If the sale of a property occurs as part of a sec. 1031 exchange, the taxpayer does not recognize gain or loss on the sale. See sec. 1031(a)(1). Sec. 1031 provides that, under certain circumstances, the sale of a property to one party and the purchase of a replacement property from a different party through a qualified intermediary is treated as an exchange of the property sold for a combination of (1) the property purchased and (2) any additional money received. See sec. 1031(a) and (b); 26 C.F.R. sec. 1.1031(k)-1(a), (g)(4) (2004). The IRS does not challenge the nonrecognition treatment of the transaction on the grounds that it did not involve a qualified intermediary.

[4]There is evidence that Adams and his wife sold the San Francisco house as cotrustees. The parties do not ascribe any significance to the possibility that Adams may have owned the house as a cotrustee instead of owning the house outright.

[**5**] bought a house in Eureka, California (Eureka house), for $340,000.[5]  Adams'

son Bill, who had extensive homebuilding and home renovation experience, lived in

Eureka.  Adams thought buying a house in Eureka would be advantageous because

Bill could manage its rental to a third party or even be the tenant himself.  Adams

chose the particular house because of its size; with five bedrooms, it suited Bill's

large family.

The Eureka house was old, dilapidated, and moldy.  It had been damaged by

a previous squatter.  Much work was required to make it livable.

Bill and his family began working on the Eureka house in July 2004.  They

worked an aggregate of 60 hours per week on the property during July, August,

and September 2004.  They repaired mold damage, replaced broken doors, fixed

holes in walls, repaired rotten subflooring, prepared floors for new carpet

installation, scrubbed and repaired surfaces for painting, painted the interior of the

house, renovated the kitchen, replumbed the kitchen and laundry room for gas,

replaced electrical fixtures and appliances, and performed landscaping.  They

exterminated rats and other pests and, on one occasion, even chased away a bear.

Their efforts made the house livable.  For July, August, and September 2004,

---

[5]Adams and his wife purchased the Eureka house together, but for simplicity we discuss the purchase as if Adams was the sole buyer.  Neither Adams nor the IRS claims that the wife's involvement changes the tax consequences.

[**\*6**] Adams accepted the services performed by Bill and his family in lieu of monetary rent. (Adams did not reimburse them for the labor and out-of-pocket costs of the home improvements.) The three months of services were worth $3,600.

In October 2004, Bill and his family started living in the Eureka house and paying monetary rent. They paid $1,200 per month in October, November, and December 2004.[6] They continued to pay rent of $1,200 per month--with one exception[7]--until they moved out in early 2008. Bill and his family also continued to maintain and conduct home improvement work on the Eureka house until they moved out. Similar houses in the neighborhood rented for a few hundred dollars more than $1,200 per month. However, the tenants did not maintain or conduct home improvement on the houses.

---

[6]The IRS argues that the December 2004 rent payment was never made because (1) it was not substantiated by documentary evidence, and (2) Adams could not recall at trial whether he received a rent payment in December 2004. However, Bill testified credibly that a $1,200 rent payment was made in December 2004. Thus, we find that Bill and his family paid $1,200 of rent in December 2004.

[7]In January 2006 or 2007 Bill was injured. He and his family could not pay rent for that month. Afterward, they paid rent of $1,300 per month until they paid off the one month of missing rent, at which time they resumed paying $1,200 per month.

**[*7]**    In the meantime Adams continued to live in Rohnert Park, where he had

moved in 1979.

The events and arrangements discussed above are summarized as follows:

| | |
|---|---|
| 1963 | Adams buys the San Francisco house for $26,000. |
| 1979 | Adams moves out of the San Francisco house and rents it out. |
| 2003 | Renter moves out of the San Francisco house. |
| 6/17/2004 | Adams sells the San Francisco house for $572,000. |
| 7/7/2004 | Adams buys the Eureka house for $340,000. |
| 7/2004 | Bill and his family begin work on the Eureka house. |
| 9/2004 | Bill and his family complete enough work on the Eureka house to make it livable by the end of the month. |
| 10/2004 - 12/2004 | Bill and his family start living in the Eureka house in October 2004.  They pay rent of $1,200 per month in October, November, and December 2004. |
| 2005-2008 | Bill and his family continue to live in the Eureka house and pay rent of $1,200 per month (with one exception, see supra note 7). |
| Early 2008 | Bill and his family move out of the Eureka house. |

2.    <u>Adams' Rental Properties</u>

During 2004, Adams owned three rental properties:

(1) the San Francisco house (which he owned until it was sold on June 17, 2004),

(2) the Eureka house (which he bought on July 7, 2004), and

**[\*8]**  (3) land in Idaho.

We discuss Adams' reporting of rental income and expenses on Schedule E, Supplemental Income and Loss, <u>infra</u> part 4.

3.      <u>Electrical-Safety-Consulting Business</u>

During 2004, Adams operated an electrical-safety-consulting business in which he investigated electrical accidents, performed hands-on electrical work, served as an expert witness, and participated in a public-utility-commission rulemaking proceeding.  He traveled from northern California to southern California to perform some of the accident investigations.  The parties have stipulated that Adams had $10,875 of gross receipts from his electrical-safety-consulting business for 2004.  We discuss the business expenses that Adams claimed on Schedule C, Profit or Loss From Business, <u>infra</u> part 4.

4.      <u>Procedural History and Adams' 2004 Federal Income-Tax Return</u>

Adams failed to timely file his 2004 federal income-tax return.[8]  Adams testified that his general practice, starting around 1999, was not to file a tax return.  Instead, each year he would estimate the amount of tax he owed using the "tax table in the income tax booklet" and send a payment to the IRS "on April 15th" for

---

[8]As we discuss later, he submitted to the IRS a Form 1040, U.S. Individual Income Tax Return, for the year 2004 in March 2008, after he filed the petition in this case.

[*9] the amount of tax that he thought he owed.  According to a Form 4340,

Certificate  of Assessments, Payments, and Other Specified Matters, for Adams'

2004 tax year, the IRS received a payment of $5,000 from Adams on April 19,

2005.

On April 9, 2007, the IRS prepared a substitute for return for Adams' 2004

tax year.  On July 16, 2007, the IRS issued a notice of deficiency to Adams for the

year 2004 that reflected the items on the substitute for return.  The substitute for

return, and thus the notice of deficiency, relied on information returns from third

parties that showed they had made payments to Adams in 2004.  The notice of

deficiency determined that the following items were included in Adams' income for

2004:

- the entire $572,000 of sale proceeds from the San Francisco house (an amount the IRS treated as ordinary income, not capital gain),

- $7,913 of nonemployee compensation,

- $3,412 of taxable Social Security benefits,

- $48,910 of pensions and annuities, and

- $293 of interest.

The only deduction that the IRS allowed Adams was a standard deduction of

$5,800, which was the 2004 statutory amount for a taxpayer who was 65 or older

**[*10]** and had the filing status of married filing separately.  See sec. 63(c)(1)-(4), (f)(1).[9]  The notice of deficiency also determined that Adams had an income-tax deficiency of $207,598, a section 6651(a)(1) addition to tax of $45,179.55, a section 6651(a)(2) addition to tax of $25,099.75, and a section 6654(a) addition to tax of $5,732.41.

Adams filed a Tax Court petition seeking redetermination of the deficiency.[10]  In his amended petition Adams claimed that his correct tax liability, calculated on a joint-return basis with his wife, was reflected on a Form 1040 for the year 2004 dated February 12, 2008, which he attached to the amended petition.[11]  Adams requested that the Court "consider the attached return in place of the proposed statutory return proposed by the respondent", i.e., the substitute for return.  The Form 1040 attached to the amended petition was unsigned and had not been submitted to the IRS for processing.  Thus it did not qualify as a return.  Even if it had been signed and submitted to the IRS for processing on the day it

---

[9]Adams was 76 years old in 2004.

[10]Adams' wife did not join his Tax Court petition.  Thus she is not a party to this case.

[11]Adams' original petition was substantially identical to his amended petition. The only significant difference was that the original petition did not include an attached Form 1040, which was apparently omitted by mistake.  For this reason, we discuss only the amended petition and the IRS's answer to it.

**[*11]** was dated (i.e., February 12, 2008), the Form 1040 would have been submitted so late that it would not affect any of the issues in this case, such as Adams' liability for additions to tax. See infra parts V.A.,V.B., and V.C. Although the Form 1040 is thus not significant as a tax return, it informs us of Adams' assignments of error. On the Form 1040 attached to his amended petition, Adams reported that he owed the IRS $34,578 for the year 2004. Adams claimed a standard deduction of $11,600. He reported the following amounts of income:

- $169,755 of capital gain from the sale of the San Francisco house,

- $26,000 of ordinary income from the sale of the San Francisco house,

- $1,990 of rental-real-estate income,

- $4,071 of business income from his electrical-safety-consulting business,

- $8,539 of taxable Social Security benefits,

- $48,910 of taxable pensions and annuities, and

- $300 of taxable interest.

Neither the Form 1040 nor the schedules and returns attached to it indicated how Adams calculated the $169,755 of capital gain or the $26,000 of ordinary income from the sale of the San Francisco house.

**[*12]**    On a Schedule E attached to the Form 1040, Adams reported that the

$1,990 of rental-real-estate income was calculated as follows:

| Income/Expense | Idaho Land | San Francisco House | Eureka House | Total |
|---|---|---|---|---|
| Rents received | $645 | 0 | $7,200 | $7,845 |
| Auto and travel | 0 | $54 | 0 | 54 |
| Insurance | 0 | 228 | 1,054 | 1,282 |
| Repairs | 0 | 0 | 1,155 | 1,155 |
| Taxes | 323 | 297 | 325 | 945 |
| Utilities | 0 | 19 | 0 | 19 |
| Painting and decorating | 0 | 0 | 2,400 | 2,400 |
| Total expenses | 323 | 598 | 4,934 | 5,855 |
| Net income (rents received minus total expenses) | 322 | (598) | 2,266 | 1,990 |

On a Schedule C attached to the Form 1040, Adams reported that the $4,071

of business income from his electrical-safety-consulting business was equal to

$10,875 in gross receipts minus the following $6,804 in expenses:

- $17 of office expenses,

- $450 of taxes and licenses,

- $1,064 of travel expenses,

**[*13]** •  $21 of meals-and-entertainment expenses (Adams accounted for section 274(n), which limits deductions for meals-and-entertainment expenses to 50% of such expenses),

•  $3,121 of dues and subscriptions,

•  $1,121 of materials,

•  $321 of postage, and

•  $689 of printing expenses.

In March 2008, Adams submitted to the IRS a Form 1040 for the tax year 2004. Except for the two differences noted below, it was identical (for the purposes of this case) to the Form 1040 that he had attached to the amended petition. The March 2008 Form 1040 differed from the Form 1040 attached to the amended petition in two ways. First, unlike the Form 1040 attached to the amended petition, the March 2008 Form 1040 was signed; the date of the signature was March 7, 2008. Second, a Form 8824, Like-Kind Exchanges, was attached to the March 2008 Form 1040. The Form 8824 indicated that the $169,755 capital gain from the sale of the San Francisco house was calculated as follows:

| | |
|---|---|
| Cash and fair market value of other property received | $195,755 |
| Plus fair market value of like-kind property received | + 340,000 |
| Minus adjusted basis of like-kind property given up | - 0 |
| Equals realized gain | 535,755 |

| | |
|---|---|
| [*14] Cash and fair market value of other property received | $195,755 |
| Minus ordinary income from depreciation recapture | - 26,000 |
| Equals capital gain recognized | 169,755 |
| | |
| Deferred gain ($535,755-$195,755) | $340,000 |

Like the Form 1040 attached to the amended petition, the March 2008 Form 1040 reported that Adams owed the IRS $34,578. The IRS's records show that it received a payment of $34,578 from Adams' on March 10, 2008. Thus we infer that the IRS received the March 2008 Form 1040 and processed it as a return.[12] The substantial lateness of the return, however, means that its submission does not affect the issues in this case. See infra parts V.A., V.B., and V.C.

The IRS's answer denied Adams' assignments of error and asserted that the notice of deficiency was correct. In response to Adams' plea that the Court accept the Form 1040 attached to the amended petition in place of the IRS's substitute for

---

[12]With the possible exception of its lateness, the March 2008 Form 1040 appears to be a valid return. Cf. In re Payne, 431 F.3d 1055, 1057-1058 (7th Cir. 2005) (very-late-filed return was not an honest and reasonable attempt to satisfy the law because the taxpayer filed the return to satisfy a condition precedent to obtaining a discharge in bankruptcy).

[*15] return, the IRS stated: "Denies the return submitted by the petitioner should be accepted as filed."

The IRS conceded at trial and on brief that Adams had a filing status of married filing jointly and that he was entitled to a standard deduction of $11,600 for 2004. The parties have also stipulated the following facts:

- Adams and his wife received $300 of taxable interest in 2004.

- Adams and his wife received $48,910 of taxable pensions and annuities in 2004.

- Adams and his wife received $8,539 of taxable Social Security benefits in 2004.

We address the remaining issues below.

## OPINION

I.    Burden of Proof

Generally, the taxpayer has the burden of proving that the IRS's determinations are incorrect. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Adams has not argued or presented evidence that the burden of proof should shift to the IRS. See sec. 7491(a). Thus Adams has the burden of proof on all issues.

**[*16]** II.    Whether Adams Engaged in a Valid Section 1031 Exchange

A.    The Parties' Positions

Adams argues that the sale of the San Francisco house and the purchase of the Eureka house was a valid section 1031 exchange that qualified for nonrecognition treatment.  He claims that both the San Francisco house and the Eureka house were held "for productive use in a trade or business or for investment" within the meaning of section 1031.  For the Eureka house in particular, Adams asserts that he charged fair market rent to Bill and his family, considering the condition of the house and the home-improvement work Bill and his family performed.  Adams also argues that the boot from the section 1031 exchange (i.e. the property he received other than the Eureka house) should be treated as capital gain, not ordinary income.  Adams argues in the alternative that if the sale of the San Francisco house was not part of a valid section 1031 exchange, then the gain from the sale should be treated as capital gain.

Adams contends that the basis of the San Francisco house--which he claims is $24,000 before adjustments--should be increased by the following amounts:

- $2,000 of closing costs that he paid when buying the house,

- $5,300 of capital improvements that he claims to have made to the house, and

**[\*17]** •        $41,789 of closing costs that he claims that he incurred when selling the house.

If these adjustments were made, the adjusted basis of the San Francisco house would be $73,089. This is different from the adjusted basis assumed in the Form 8824 calculations, which was zero.

The IRS argues that the sale of the San Francisco house and the purchase of the Eureka house did not qualify as a section 1031 exchange. The IRS claims that Adams acquired the Eureka house for personal purposes--i.e., "with the intention of letting his son and family live there at below market rent." Thus, the IRS claims, Adams must recognize gain for 2004 on the sale of the San Francisco house. The IRS asserts that the adjusted basis in the San Francisco house was zero because (1) his initial basis was $26,000 (the amount he paid to purchase the property, including closing costs of $2,000), against which he claimed $26,000 of depreciation deductions, and (2) he has not shown that he made any capital improvements to the property. The IRS claims that Adams recognized gain of $538,062.15 for the year 2004 on the sale of the San Francisco house. The IRS calculated the $538,062.15 by subtracting $33,889.60 of selling costs from the $572,000 sale price.[13] The IRS asserts that the $538,062.15 it calculated as recognized gain consists of

---

[13]Actually, the difference between $572,000 and $33,889.60 is $538,110.40.

[*18] $512,062.15 of long-term capital gain and $26,000 of ordinary income from depreciation recapture.

Both parties agree that if Adams engaged in a valid section 1031 exchange, the boot he received in the transaction is taxable to him. (In neither party's view does the adjusted basis of the San Francisco house need to be ascertained in determining the tax consequences of the exchange, assuming the exchange is a valid section 1031 exchange.) The IRS's brief proposes a method for calculating boot, but not the exact amount. The brief takes the position that the amount of boot is equal to the net proceeds from the sale of the San Francisco house minus the purchase price of the Eureka house. If the IRS's method of calculating boot is used, boot would be calculated as follows:

| | |
|---|---|
| Sale price of San Francisco house | $572,000.00 |
| Expenses from sale of San Francisco house | -33,889.60 |
| Net proceeds from sale of San Francisco house[1] | 538,110.40 |
| Purchase price of Eureka house | -340,000.00 |
| Boot | $198,110.40 |

[1]The IRS's brief erroneously calculates the difference as $538,062.15.

In Adams' view, the amount of boot is equal to:

| | |
|---|---|
| [*19] Sale price of San Francisco house | $572,000.00 |
| Expenses from sale of San Francisco house | -36,245.00 |
| Net proceeds from sale of San Francisco house | 535,755.00 |
| Purchase price of Eureka house | -340,000.00 |
| Boot | $195,755.00 |

B.    Analysis

Section 1031(a)(1) provides:  "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."

We find that Adams bought the Eureka house "for investment" within the meaning of section 1031(a)(1).  In determining whether the taxpayer intended to hold the acquired property for investment in a section 1031 exchange, we consider the taxpayer's intent at the time of the exchange.  Click v. Commissioner, 78 T.C. 225, 231 (1982).  The taxpayer's conduct before and after the exchange can inform our determination of the taxpayer's intent.  See id. at 231-234.  Although Adams chose the Eureka house because Bill and his family lived in Eureka and the house suited Bill's large family, we do not believe Adams intended to charge Bill and his

**[\*20]** family below-market rent. Bill and his family paid rent of $1,200 per month

from July to December 2004 and continued to pay rent of $1,200 per month (or

$1,300 per month when making up for the one month's missed rent) until they

moved out in early 2008.[14] See supra part 1. The monthly rent of $1,200 was a fair

rental value because Bill and his family assumed substantial responsibilities for

renovating, maintaining, and repairing the Eureka house. Even though Adams stated

that the rental of the Eureka house was a "gift" when pressed on cross-examination,

we construe his testimony to mean that he wished to offer Bill reduced rent in

exchange for working on the house.

We conclude that the sale of the San Francisco house and the purchase of the

Eureka house constituted a valid section 1031 exchange of like-kind property to be

held "for investment".[15] However, under section 1031(b), Adams must recognize

gain to the extent of the boot he received in the exchange. Section 1031(b)

provides:

> If an exchange would be within the provisions of subsection (a) * * *
> if it were not for the fact that the property received in exchange

---

[14]As discussed supra part 1, the $7,200 of rent that Bill and his family paid in 2004 consisted of $1,200 per month in the form of services from July to September 2004, and $1,200 per month in the form of money from October to December 2004.

[15]The IRS does not argue that the San Francisco house was not held for investment.

[*21] consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

Because Adams received boot in the section 1031 exchange, we must determine the amount and character of the gain that Adams should recognize from the transaction.

The parties take different positions with respect to the selling costs of the San Francisco house. The IRS's position, that the selling costs were $33,889.60, is supported in its brief by citations of the record. Adams' position, that the selling costs were $36,245, is unsupported in his brief by citations of the record. We adopt the IRS's position that the selling costs were $33,889.60. We therefore determine that the boot from the exchange of the properties, and therefore Adams' taxable gain, was $198,110.40. Both parties agree that the taxable gain is ordinary income only to the extent of $26,000. Therefore, the remainder, $172,110.40 ($198,110.40 - $26,000), is capital gain. In summary, we hold that the taxable gain from the exchange of the properties is in the amount and of the character determined using the method proposed by the IRS: ordinary income of $26,000 and capital gain of $172,110.40.

**[*22]** III.     Income and Expenses From Adams' Rental Properties

We find that Adams had $7,200 of Schedule E gross income for 2004 in the form of rents received from his rental properties. Adams owned three rental properties in 2004: the San Francisco house, the Eureka house, and the land in Idaho.

Adams received no rent for the San Francisco house in 2004, as the renter had moved out in 2003.

As discussed supra part 1, we find that Adams' gross rental income for 2004 from the Eureka house was $7,200.

On both the Form 1040 attached to the amended petition and the March 2008 Form 1040, Adams reported that he received rent of $645 from the Idaho land. In its answer the IRS asserted that the notice of deficiency was correct. The notice of deficiency does not assert Adams earned any Schedule E income. Therefore the IRS's position in its answer is that Adams did not earn rental income from the Idaho property. We accept the IRS's concession that Adams earned no income from the Idaho land: the concession was reflected in the answer, and this was the last thing either party said about the income from the Idaho land.

On both the Form 1040 attached to the amended petition and the March 2008 Form 1040, Adams claimed $5,855 of rental-property expenses from three

[*23] properties (the San Francisco house, the Eureka house, and the Idaho land).

See supra part 4. However, Adams has provided evidence for only one rental-property expense--a $1,054 payment for property insurance on the Eureka house. On brief Adams specifically argued that we should allow a $1,054 deduction for insurance on the Eureka house, but he did not argue that we should allow other rental-property-expense deductions. We consider Adams to have conceded that he is not entitled to deduct the other rental-property expenses that he reported on Schedule E. The IRS contends that Adams is not entitled to any deductions for rental-property expenses. We thus examine whether Adams can deduct the $1,054 payment for property insurance on the Eureka house.

We conclude that the $1,054 payment is deductible under section 212. Section 212 provides (in relevant part) that an individual taxpayer can deduct all the ordinary and necessary expenses paid or incurred (1) "for the production or collection of income" or (2) "for the management, conservation, or maintenance of property held for the production of income". Sec. 212(1) and (2). The $1,054 property-insurance payment relates to the Eureka house, which Adams maintained for the production of rental income. See supra part II.B. Thus the $1,054 property-insurance payment is deductible under section 212.

[*24] The IRS also argues that section 280A limits any deductions associated with the Eureka house. Section 280A generally allows deductions related to a dwelling unit, except that "no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." Under section 280A(d), a taxpayer is treated as using a dwelling unit during the taxable year as a residence if the taxpayer rents the dwelling unit to a family member, unless the taxpayer rents the dwelling unit to the family member "at a fair rental" and for use as that family member's principal residence. Sec. 280A(d)(1), (2)(A), (3)(A). We find that Adams used the Eureka house not as a residence, but as a rental property. Adams did not live in the Eureka house. Instead he rented it to Bill's family, who used the Eureka house as their principal residence and paid fair rent of $1,200 per month from July to December 2004. See supra parts 1, II.B. Although $1,200 per month was slightly below market, it was a fair rent considering the ongoing work that Bill had performed on the house. Thus the section 280A(a) prohibition of deductions for dwelling units used as residences does not apply to the Eureka house.

In summary, the gross rents received were zero for the San Francisco house, $7,200 for the Eureka house, and zero for the Idaho land. The allowable rental-

[*25] property expenses were zero for the San Francisco house, $1,054 for the Eureka house, and zero for the Idaho land.

III.  Allowable Deductions for Adams' Electrical-Safety-Consulting Business

The parties have stipulated that Adams operated an electrical-safety-consulting business in 2004 and that he had gross receipts of $10,875 from this business for 2004.  The parties dispute the deductions to which Adams is entitled for his business.  Adams claims that he is entitled to $6,804 of deductions, in the following categories:

- $17 of office expenses,

- $450 of taxes and licenses,

- $1,064 of travel expenses,

- $21 of meals-and-entertainment expenses,[16]

- $3,121 of dues-and-subscriptions expenses,

- $1,121 of materials expense,

- $321 of postage expenses, and

- $689 of printing expenses.

---

[16]The $21 amount accounts for the 50% limitation on deductions for meals-and-entertainment expenses.  See sec. 274(n)(1).

**[\*26]** The IRS argues that Adams is entitled only to the following deductions: $17 of office expenses, $145.70 of travel expenses, $1,950.60 of dues-and-subscriptions expenses, and $885.98 of materials expense.

Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses incurred by the taxpayer in carrying on a trade or business. An expense is "ordinary" if it is "normal, usual, or customary" in the taxpayer's trade or business. See Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is "necessary" if it is "appropriate and helpful" in the taxpayer's business, but it need not be absolutely essential. Commissioner v. Tellier, 383 U.S. 687, 689 (1966) (citing Welch v. Helvering, 290 U.S. 111, 113 (1933)). Whether an expense is deductible under section 162 is a question of fact to be decided on the basis of all the relevant facts and circumstances. Cloud v. Commissioner, 97 T.C. 613, 618 (1991) (citing Commissioner v. Heininger, 320 U.S. 467, 473-475 (1943)).

In addition to the requirements of section 162(a), section 274(d) imposes strict substantiation requirements for certain expenses, including expenses for travel, meals, and entertainment. No deduction is allowed for travel, meal, or entertainment expenses unless the taxpayer "substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement": (1) the amount of the expense; (2) the time and place of the travel, meal, or entertainment; (3)

[*27] the business purpose of the expense; and (4) (for entertainment expenses) the business relationship to the taxpayer of the persons entertained.  Sec. 274(d).

We address Adams' entitlement to deductions for each of his eight categories of business expenses.  As we explain below, Adams is entitled to $4,416.07 of deductions for his electrical-safety-consulting business.

### A.    Office Expenses

Adams can deduct $17 of office expenses on Schedule C.  The parties have agreed, and we find, that Adams is entitled to a $17 deduction for office expenses.

### B.    Taxes and Licenses

Adams is entitled to a Schedule C deduction of $450 for taxes and licenses. Adams credibly testified that in 2004 he paid $300 for a two-year state contractor's license and $150 for a one-year City of Rohnert Park business license.  We find Adams' testimony sufficient as evidence of payment.  Furthermore, the record contains a printout from the California Department of Consumer Affairs, Contractors State License Board, indicating that Adams had an active electrical contractor's license from November 17, 1988, to November 30, 2008.

### C.    Travel Expenses

Adams is entitled to a Schedule C deduction of $145.70 for travel expenses. Although Adams reported $1,064 of travel expenses on Schedule C, the record

**[\*28]** contains documentation for only $397.33 of travel expenses: (1) a $22 check to Airport Express dated December 30, 2003; (2) a $145.70 Southwest Airlines receipt for a roundtrip flight from Oakland, California, to Orange County, California, leaving November 2, 2004, and returning November 3, 2004; (3) a $145.70 Southwest Airlines receipt for a roundtrip flight from Oakland, California, to Orange County, California, leaving December 8, 2004, and returning the same day (a receipt bearing the handwritten notation "Electric Line Inspection"); and (4) an $83.93 credit card charge to Best Western in Santa Ana, California (in Orange County), on November 3, 2004. Adams testified that he paid $22 to Airport Express for transportation to the airport. Adams also testified that the November 2004 trip to Orange County, the December 2004 trip to Orange County, and the Best Western hotel expense were all for "business purposes". He did not elaborate, however, on the business purposes served by these three expenses.

The IRS concedes that Adams is entitled to deduct $145.70 for the December 2004 trip to Orange County. We thus consider whether Adams is entitled to deduct the other travel expenses for which there is documentation in the record. (One such expense is the $145.70 cost of the November 2004 trip to Orange County. The deductibility of this trip is unconceded.)

**[\*29]** Adams cannot deduct the $22 paid to Airport Express. That expense was incurred in 2003, not 2004 (the year in issue).

Adams cannot deduct the $145.70 for the November 2004 roundtrip flight to Orange County or the $83.93 paid to Best Western because he failed to substantiate the business purpose of these expenses. See sec. 274(d). Adams' general assertion that these expenses were for "business purposes" is insufficient. To find business purpose, we need at least (1) a statement by Adams that details the specific business purpose served by the expenses and (2) separate evidence corroborating his statement.[17] See 26 C.F.R. sec. 1.274-5T(c)(3)(i) (2004), 50 Fed. Reg. 46020 (Nov. 6, 1985); Rutz v. Commissioner, 66 T.C. 879, 885-886 (1976). We have neither.

For the above reasons, Adams is entitled to deduct only the $145.70 of travel expenses that the IRS concedes (the expenses of the December 2004 flight).

D.    Meals-and-Entertainment Expenses

Adams is not entitled to deduct any Schedule C expenses for meals and entertainment. Adams testified that he "sometimes" had meals and entertained people, but the record is devoid of any documentation on the amount, date, location, or business purpose of any meals or entertainment expenses. See sec.

_____

[17]Adams had no records of the business purpose. Thus, he does not satisfy the adequate-records test. See sec. 274(d).

**[*30]** 274(d).  There is also no evidence concerning the business relationship to Adams of any people he might have entertained.  See id.

E.     Dues-and-Subscriptions Expenses

Adams is entitled to deduct $1,850.60 for dues-and-subscriptions expenses. Although Adams reported $3,121 of dues and subscriptions on Schedule C, the record contains documentation for only $1,907.60 of dues-and-subscriptions expenses:

- $578 to Redwood Empire American Subcontractors Association,

- $100 to Redwood Empire National Electrical Contractors Association,

- $600 to Redwood Empire National Electrical Contractors Association,

- $279.60 to International Brotherhood of Electrical Workers,

- $130 to International Society of Arboriculture,

- $30 to Redwood Empire American Subcontractors Association,

- $43 to Daily Journal Corp. for a directory of California lawyers,

- $57 to Thomson West for the publication "Electrical Safety Orders US", and

- $90 to International Association of Electrical Inspectors.

**[\*31]** All of the above expenses were paid in 2004 (the year in issue), except the $57 to Thomson West, which was paid in October 2006.

There is $1,213.40 in dues-and-subscription expenses for which the record contains no documentation. There is no evidence--written or otherwise--that Adams incurred these expenses. Adams has not shown that he is entitled to deduct these expenses, and thus cannot do so.

The IRS concedes on brief that Adams is entitled to deduct $1,950.60 of dues-and-subscriptions expenses. We find, however, that the IRS made two mistakes in calculating the $1,950.60 amount of its concession. First, the IRS appears to have double-counted the $43 payment to Daily Journal Corp.[18] There are two documents in the record that show a $43 payment to Daily Journal Corp., but closer inspection reveals that the two documents relate to the same payment. Second, the IRS counted the $57 payment to Thomson West even though it was incurred in 2006. Since the record plainly reveals that the IRS erred in calculating the amount of its concession, we choose not to accept its concession as stated on brief. We believe that the IRS intended to concede that Adams could deduct all of the dues-and-subscriptions expenses that (1) were paid in 2004 and (2) are

---

[18]If we add another $43 payment to the list of expenses above, see supra p. 30, we arrive at $1,950.60--instead of $1,907.60--as the total amount of dues-and-subscription expenses that are documented in the record.

**[*32]** documented in the record. Under this interpretation, the IRS meant to concede a total of $1,850.60 of dues-and-subscriptions expenses.

For the above reasons, Adams is entitled to deduct only $1,850.60 of the reported $3,121 of dues-and-subscriptions expenses.

### F.    Materials Expenses

Adams is entitled to deduct Schedule C expenses of $1,429.63 for materials. The record contains documentation of various payments made in 2004 to Maltby Electric, Yardbirds, and Friedman Brothers Hardware, totaling $1,429.63. Adams testified credibly that he purchased materials from these three stores that he then used in his electrical-safety-consulting business. The IRS does not argue that any portion of the $1,429.63 spent on materials was a personal expense; thus we need not consider the possibility that the $1,429.63 included materials that Adams bought for personal use.

The IRS contends that, when Adams calculated the $1,121 of materials expense that he reported on Schedule C, he included materials that may have been purchased before 2004. While Adams admitted on cross-examination that the $1,121 may have included materials that he purchased before 2004, this fact is irrelevant. The record shows--independently of the calculations Adams used for his return--that Adams bought $1,429.63 of materials in 2004 for his business.

[*33] Thus we need not examine whether the calculations Adams used for his return were correct.

For the above reasons, Adams is entitled to deduct $1,429.63 of materials expenses.

G.    Postage Expenses

Although Adams reported $321 of postage expenses on Schedule C, the record contains documentation for only $296.79 of postage expenses, which were incurred at various post office locations. Of the $296.79 of documented postage expenses, Adams testified that he paid $18.11 to a post office in Rohnert Park, California, to mail copies of pleadings that he had filed with the California Public Utilities Commission (Commission). He testified that the pleadings concerned an order-instituting-rulemaking proceeding that was pending before the Commission and that he sent copies of the pleadings to the service list for the proceeding, which involved 60 to 70 addresses. We find that the $18.11 postage expense was an ordinary and necessary expense of Adams' electrical-safety-consulting business. Adams has not demonstrated that the other $278.68 of documented postage expenses was related to his business. For the $24.21 of undocumented postage expenses, there is no evidence that Adams incurred these expenses. Thus he can deduct only $18.11 of postage expenses.

**[*34]** H.     Printing Expenses

Adams reported $689 of printing expenses on his Schedule C. The record contains receipts for $525.40 of the printing expenses. The receipts show 17 different payments to Kinko's for printing expenses totaling $505.03. There are also two receipts for printing expenses from Clone Digital Print & Copy. Of the 19 printing-expense receipts in the record, 9 receipts bear the handwritten notation "OIR"--8 Kinko's receipts and 1 Clone Digital Print & Copy receipt. We infer that "OIR" stands for "Order Instituting Rulemaking". It is unclear whether the "OIR" notations were made when Adams received the receipts or sometime later. Under the circumstances, the value of the "OIR" notation to us is limited. Adams testified that the 17 payments to Kinko's were the expenses of making copies of the pleadings that he filed with the Commission. We find that these expenses relate to Adams' electrical-safety-consulting business.

Adams has not proven that the printing expenses other than the Kinko's expenses were business expenses. We conclude that the amount of Adams' deductible printing expenses is $505.03.

I.     Conclusion

In conclusion, Adams had $4,416.07 of deductible business expenses in 2004 from his electrical-safety-consulting business. Subtracting these deductions

**[\*35]** from his $10,875 of gross receipts yields $6,458.93 in net profits in 2004 from his electrical-safety-consulting business.

V.     Additions to Tax

The IRS has the burden of production with respect to additions to tax and penalties. Sec. 7491(c). The IRS satisfies this burden by producing sufficient evidence indicating that it is appropriate to impose the relevant addition to tax or penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the IRS satisfies its burden of production, the taxpayer has the burden of persuading the Court that he is not liable for the addition to tax or penalty. Id. at 446-447. If the taxpayer wishes to raise an exception, or affirmative defense, to an addition to tax or penalty, the taxpayer bears the burden of producing evidence on the exception and persuading the Court that the exception applies. See id. (stating that the IRS "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions").

A.     Section 6651(a)(1) Addition to Tax

The IRS determined that Adams was liable for a $45,179.55 addition to tax under section 6651(a)(1) for failing to timely file his 2004 tax return. Adams admits that he failed to timely file his 2004 tax return. But he argues that he had reasonable cause for failing to timely file the return because:  (1) he did not realize

**[\*36]** he had a filing requirement for 2004; (2) his "advanced age" prevented him from timely filing the return; and (3) he had no relevant education or knowledge of tax law.

Section 6651(a)(1) imposes an addition to tax for failing to file a return by the filing deadline (as extended), unless such failure is due to reasonable cause and not due to willful neglect. For each month the return is late, the addition to tax is 5% of the tax due, not to exceed 25% in the aggregate.[19] Sec. 6651(a)(1). If the section 6651(a)(2) addition to tax (for failure to timely pay tax) runs concurrently with the section 6651(a)(1) addition to tax, the 5% per month addition to tax under section 6651(a)(1) is reduced to 4.5% per month. Sec. 6651(c)(1).

Reasonable cause for the failure to timely file a return exists if the taxpayer exercised ordinary business care and prudence but, nevertheless, was unable to file the return on time. 26 C.F.R. sec. 301.6651-1(c)(1) (2012). In order to prove he or she did not act with "willful neglect", a taxpayer must show that the late filing did not result from a "'conscious, intentional failure or reckless indifference.'"

---

[19]For sec. 6651(a)(1), the tax due is "the amount of tax required to be shown on the return * * * reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return". Sec. 6651(b)(1).

**[*37]** <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 221 (1992) (quoting <u>United States v. Boyle</u>, 469 U.S. 241, 245-246 (1985)).

The IRS has met its burden of production for the section 6651(a)(1) addition to tax. The record shows that Adams did not file his 2004 tax return until March 2008--after he had filed his Tax Court petition in this case. Thus Adams failed to timely file his 2004 tax return. <u>See</u> sec. 6072(a).

Adams has not shown that he had reasonable cause for failing to timely file his 2004 tax return. "A taxpayer's belief that no return is required in itself is not sufficient to show that the failure to file was due to reasonable cause." <u>Niedringhaus v. Commissioner</u>, 99 T.C. at 221. Moreover, we find it implausible that Adams did not believe he had a filing requirement for 2004. Adams testified that his general practice, starting around 1999, was not to file a return. Instead, each year, he would estimate the amount of tax he owed using the "tax table in the income tax booklet" and send a payment to the IRS "on April 15th" for the amount of tax that he thought he owed. We conclude that Adams knew he was required to file a 2004 return and deliberately chose not to file the return on time.

We also do not believe that Adams' age or purported lack of tax knowledge prevented him from timely filing his 2004 return. Adams has not provided any evidence that his age resulted in an inability to timely prepare and

[*38] file his 2004 tax return.  On the contrary, his ability to engage in a section 1031 exchange--a relatively complex transaction--indicates that his physical and mental faculties were intact.  Adams' decision to engage in a section 1031 exchange also suggests that he was not entirely lacking in tax knowledge.  In addition, Adams was able to estimate the amount of tax due from tax tables, which suggests some working knowledge of tax law.  We believe Adams had sufficient knowledge of tax law to know that he was required to file a return.[20]

We hold that Adams is liable for the section 6651(a)(1) addition to tax for failing to timely file his 2004 tax return.

### B.    Section 6651(a)(2) Addition to Tax

The IRS determined that Adams was liable for a $25,099.75 addition to tax under section 6651(a)(2) for failing to timely pay his 2004 tax.  Adams argues that he is not liable for the section 6651(a)(2) addition to tax because the IRS did not prepare a valid substitute for return for 2004.  Adams also argues that he had reasonable cause for failing to timely pay his tax because:  (1) his "advanced age" prevented him from timely paying his tax, and (2) he had no relevant education or knowledge of tax law.

---

[20]Of course, unawareness of one's legal obligations is not reasonable cause for not filing.  Carlebach v. Commissioner, 139 T.C. __, __ (slip op. at 27) (July 19, 2012).

**[\*39]** Section 6651(a)(2) imposes an addition to tax for failing to pay the tax shown on a return on or before the date prescribed for payment, unless such failure is due to reasonable cause and not due to willful neglect.  For each month the taxpayer fails to pay the tax shown, the addition to tax is 0.5% of the net amount of tax due at the beginning of each month, not to exceed 25% in the aggregate.  Sec. 6651(a)(2), (b)(2).  When a taxpayer does not file a return, the IRS may prepare a substitute for return.  Sec. 6020.  Such a return, if it meets the requirements of section 6020(b), is treated as the return filed by the taxpayer for purposes of the section 6651(a)(2) addition to tax.  Secs. 6020(b), 6651(g)(2); Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); O'Boyle v. Commissioner, T.C. Memo. 2010-149, slip op. at 18  (for a return prepared by the IRS to constitute a section 6020(b) return, it must be subscribed, must contain sufficient information from which to compute the taxpayer's tax liability, and must purport to be a return), aff'd, 464 Fed. Appx. 4 (D.C. Cir. 2012).

Reasonable cause for the failure to timely pay taxes exists if "the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either

**[\*40]** unable to pay the tax or would suffer an undue hardship * * * if he paid on the due date." 26 C.F.R. sec. 301.6651-1(c)(1) (2012).

The IRS has met its burden of production for the section 6651(a)(2) addition to tax. We find that the IRS prepared a valid substitute for return for Adams' 2004 tax year and that he failed to timely pay the tax shown on the substitute for return. The record contains a return prepared by the IRS that is subscribed, is sufficient to compute Adams' tax liability, and is certified to be a return. Adams fails to allege specific reasons that the substitute for return was invalid. There is no evidence in the record that suggests that the substitute for return was invalid. Therefore, we conclude that the IRS prepared a valid substitute for return for Adams' 2004 tax year. See Wheeler v. Commissioner, 127 T.C. at 209-210 (to meet its burden of production, the IRS must introduce evidence that a valid substitute for return was made).

The IRS's records show that it received a payment of $5,000 on April 19, 2005, and a payment of $34,578 on March 10, 2008, with respect to Adams' 2004 tax. The $5,000 payment did not cover all of the tax shown on the substitute for return. The $34,578 payment occurred too late to affect the calculation of the section 6651(a)(2) addition to tax, as the addition to tax had already reached the

**[\*41]** maximum of 25% of the net amount of tax due. Therefore, we conclude that Adams failed to timely pay the tax shown on the substitute for return.[21]

Adams has not shown that he had reasonable cause for failing to timely pay his 2004 tax. For reasons similar to those we articulated supra part V.A., we find that Adams' age and purported lack of tax knowledge did not prevent him from timely paying his 2004 taxes.

We hold that Adams is liable for the section 6651(a)(2) addition to tax.[22]

C.    Section 6654(a) Addition to Tax

The IRS determined that Adams was liable for a section 6654(a) addition to tax for failing to pay estimated tax. Adams argues that he is not liable for the

---

[21]Adams' $5,000 payment on April 19, 2005, does reduce the net amount of tax due for each month after the payment was made. See sec. 6651(b)(2). The reduction in the net amount of tax due means that the sec. 6651(a)(2) addition to tax (a percentage penalty) applies to a smaller amount of tax due for months after April 19, 2005.

[22]Although Adams did ultimately file a 2004 tax return, he did not file the return until March 2008, which was after he filed his Tax Court petition in this case. Thus, in preparing the notice of deficiency, the IRS did not err in using the substitute for return to determine Adams' liability for the sec. 6651(a)(2) addition to tax. Neither party has raised the issue of whether Adams' late-filed 2004 tax return means that his liability for the sec. 6651(a)(2) addition to tax should be calculated using the tax shown on the 2004 return, rather than the tax shown on the substitute for return. See Hardin v. Commissioner, T.C. Memo. 2012-162, slip op. at 4, 9. If either party believes that further briefing is required, that party should make a motion to file additional briefs before the deadline for Rule 155 computations.

**[*42]** section 6654(a) addition to tax because: (1) he qualifies for the exception under section 6654(e)(1); (2) he qualifies for the exception under section 6654(e)(2); (3) he qualifies for the exception under section 6654(e)(3)(B); and (4) he had reasonable cause for failing to pay estimated tax because of his "advanced age" and his lack of understanding of the tax consequences of the section 1031 exchange.

Section 6654(a) imposes an addition to tax for failing to make estimated tax payments as required by section 6654(b)-(d). The addition to tax is calculated by applying the section 6621 underpayment interest rate to the amount of each underpayment from the due date of each installment until April 15 following the close of the taxable year (for calendar-year taxpayers). Sec. 6654(a), (b)(2). The amount of each underpayment is "the excess of * * * the required installment" over "the amount (if any) of the installment paid on or before the due date for the installment." Sec. 6654(b)(1). The "required installment" is due at four times during the year and is 25% of the "required annual payment". Sec. 6654(c)(1), (d)(1)(A). The "required annual payment" is equal to

the lesser of--

(i) 90 percent of the tax shown on the return for the taxable year (or, if no return is filed, 90 percent of the tax for such year), or

> **[\*43]** (ii) 100 percent of the tax shown on the return
> of the individual for the preceding taxable year.
>
> Clause (ii) shall not apply if the preceding taxable year was not a
> taxable year of 12 months or if the individual did not file a return for
> such preceding taxable year.

Sec. 6654(d)(1)(B).

The IRS has met its burden of production for the section 6654(a) addition to tax. Adams did not file a tax return for 2003. And although Adams filed a tax return for 2004, his 2004 return was filed too late to be considered a filed return for purposes of section 6654(d)(1)(B)(i). See Mendes v. Commissioner, 121 T.C. 308, 325 (2003) (a return filed after a notice of deficiency is issued is not considered a filed return for purposes of section 6654(d)(1)(B)(i)). Thus Adams' required annual payment for 2004 was 90% of his tax liability for 2004. See sec. 6654(d)(1)(B). Adams did not make any tax payments for the year 2004 until April 19, 2005, when he sent $5,000 to the IRS. His four required installments for 2004 were all due before April 19, 2005. See sec. 6654(c)(2). Therefore, Adams had an underpayment with respect to each of his four "required installments" for 2004. See sec. 6654(b)(1).

Adams' qualification for the section 6654(e)(1) exception to the addition to tax will depend on the outcome of the Rule 155 computations. Under section

**[*44]** 6654(e)(1), the section 6654(a) addition to tax does not apply if the tax shown on the return for the taxable year (or, if no return is filed, the tax)--as reduced by the credit allowable under section 31 (i.e., a wage withholding credit)--is less than $1,000. As Adams is considered not to have filed a return for purposes of section 6654, he will qualify for the section 6654(e)(1) exception if his tax liability for 2004, reduced by any section 31 credit, is less than $1,000. Rule 155 computations will determine Adams' exact tax liability for 2004 and thus his qualification for the section 6654(e)(1) exception.

Adams does not qualify for the section 6654(e)(2) exception to the addition to tax. Under section 6654(e)(2), the section 6654(a) addition to tax does not apply if the taxpayer had no tax liability for the preceding taxable year.[23] Exhibit 35-J is a Form 4340 for Adams' 2003 tax year. The Form 4340 shows that Adams had a tax liability for 2003. Thus he cannot qualify for the section 6654(e)(2) exception to the addition to tax.

Adams does not qualify for the section 6654(e)(3)(B) exception to the addition to tax. Under section 6654(e)(3)(B), the section 6654(a) addition to tax does not apply if the taxpayer (1) retired after reaching age 62, or became

---

[23]The preceding taxable year must have been a taxable year of 12 months, and the taxpayer must have been a U.S. citizen or resident throughout the preceding taxable year. Sec. 6654(e)(2).

**[*45]** disabled, in the taxable year or the preceding taxable year, and (2) the underpayment was due to reasonable cause and not to willful neglect. Although Adams was over 62 at the time, the record does not indicate whether he retired in 2004 (the taxable year at issue) or 2003 (the preceding taxable year). We find that Adams did not become disabled during 2004 or 2003, despite his claim of "advanced age". In 2004 Adams was capable of engaging in a section 1031 exchange, managing rental properties, and operating an electrical-safety-consulting business. All of these activities strongly suggest that he was not disabled. On the basis of the record, we conclude that Adams does not meet the first requirement for the section 6654(e)(3)(B) exception. Thus we need not consider whether his underpayment was due to reasonable cause.

Lastly, Adams raises a separate reasonable-cause defense to the 6654(a) addition to tax. However, there is no reasonable-cause exception to the section 6654(a) addition to tax; the taxpayer is subject to the addition to tax unless one of the 6654(e) exceptions applies. See 26 C.F.R. sec. 1.6654-1(a)(1) (2004); Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980); Estate of Ruben v. Commissioner, 33 T.C. 1071, 1071-1072 (1960).

**[\*46]** We hold that Adams is liable for the section 6654(a) addition to tax unless Rule 155 computations show that he qualifies for the section 6654(e)(1) exception to the addition to tax.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.